IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONALD D. DAVIS,

                   Plaintiff,                    CV-05-6267-ST

      v.                                     FINDINGS AND
                                             RECOMMENDATION

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

                   Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Donald D. Davis ("Davis"), brings this action pursuant to 42 USC §§ 405(g)

and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act, 42 USC §§ 401-433.  The court has jurisdiction under 42 USC § 405(g).

For the reasons that follow, the Commissioner's denial should be reversed, and this case should

be remanded for further administrative proceedings.

///

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Davis was born in 1953.[1]  Tr. 20.[2]  He has a high school education and three years of
college.  Tr. 113.  His past work experience of 30 years (Tr. 405) includes jobs as an aircraft
inspector, assembler, customer service representative, sales person, veterinarian assistant,
mechanic and janitor.  Tr. 20, 28.

Davis filed an application for DIB on September 5, 2001, alleging disability beginning
June 12, 2001 (Tr. 88-91) due to a combination of impairments, including snapping scapula
syndrome,[3] chronic myofascial scapular pain,[4] severe depression, anxiety and significant sleep
disturbance.  Tr. 107.  His date last insured is December 31, 2006.  Tr. 335.

Davis' application for DIB was denied initially and upon reconsideration.  Tr. 63-75.   He
requested a hearing, which was held on April 14, 2003, before Administrative Law Judge
("ALJ") Riley J. Atkins.  Tr. 28-60.  On September 10, 2003, the ALJ issued a decision finding
Davis not disabled within the meaning of the Social Security Act.  Tr. 19-26.  That decision
became the final decision of the Commissioner on November 3, 2003, when the Appeals Council
denied Davis' request for review.  Tr. 4-5.  Davis filed a complaint in the United States District
Court for the District of Oregon.  After the parties submitted a Joint Motion to Remand, on

---

[1]  In accordance with Local Rule 10.3(a)(3), only the relevant year is given.

[2]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the
Commissioner's Answer (docket # 8).

[3]  The "snapping scapula syndrome" occurs when movement of the scapulothoracic joint (located where the shoulder
blade glides along the chest) causes feelings or sounds of grating, grinding, popping, or thumping, and the soft tissues between
the scapula and the chest wall are thick, irritated, or inflamed.  *See* Montana Spine Center, *A Patient's Guide to Snapping
Scapula Syndrome*, http://www.eorthopod.com/eorthopodV2/index.php/fuseaction/topics.detail/ID/
79791a8f7dd9f446b38653cbeab9a955/TopicID/c4e0ddc867e3083e0a73734645660d37/area/6 (last visited July 19, 2006).

[4]  Myofascial scapular pain is pain "pertaining to or involving the fascia surrounding and associated with muscle
tissue" in the shoulder blade "opposite the second to the seventh ribs in the upper part of the back."  DORLAND'S POCKET
MEDICAL DICTIONARY (25th ed. 1995), p. 536.

August 10, 2004 Judge Redden signed an order to reverse and remand for further administrative proceedings pursuant to sentence four of 42 USC § 405(g).  Tr. 346-47.  On April 18, 2005, a hearing was held before ALJ Thomas P. Tielens.  Tr. 396-438.  On May 26, 2005, the ALJ issued a decision finding Davis not disabled.  Tr. 334-41.  That decision became the Commissioner's final decision when the Appeals Council declined Davis' request for review on August 21, 2005.  Tr. 328-30.  Davis now seeks judicial review of the Commissioner's final order.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 404.1520.[5]  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under step two.  20 CFR § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 CFR § 404.1520(c).

---

[5] Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"  42 USC § 423(d)(1)(A).

3 - FINDINGS AND RECOMMENDATION

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under step four.  20 CFR § 404.1520(d).

If the adjudication proceeds beyond Step Three, the Commissioner must assess the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

Step Four.  The Commissioner determines whether the claimant is able perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates he or she cannot perform work done in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 CFR § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can perform.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled.  If the

4 - FINDINGS AND RECOMMENDATION

Commissioner does not meet this burden, the claimant is disabled.  20 CFR §§ 404.1520(f), 404.1566.

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id.*

## THE ALJ'S FINDINGS

At step one, the ALJ found that Davis had not engaged in substantial gainful activity since the alleged onset of disability.  Tr. 340.

At step two, the ALJ found that Davis suffered from the following severe impairments: "adjustment disorder with mixed depression/anxiety, a pain disorder, chronic myofascial scapular pain, and probable fibromyalgia."  Tr. 337.

At step three, the ALJ found that Davis' impairments did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, Regulations Part 404.  *Id.*  The ALJ determined that Davis retained the RFC to:

> lift ten pounds occasionally and less than ten pounds frequently.  He requires a sit and/or stand option.  He can occasionally crouch, crawl, use stair [sic] and climb.  He should avoid hazards.  He is capable of only semi-skilled work given his pain and mental impairments.

Tr. 340.

At step four, the ALJ found that Davis was able to perform his past work as a bookstore cashier and assembly worker at HAAS automotive.  Tr. 340-41.  In the alternative, at step five, the ALJ found that, based on the RFC and on the VE's testimony, Davis could perform other work existing in significant numbers in the national economy.  Tr. 341.

///

5 - FINDINGS AND RECOMMENDATION

///

# STANDARD OF REVIEW

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The *prima facie* burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted).  The Commissioner bears the burden of fully and fairly developing the record, even when the claimant is represented by counsel.  *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991) (citations omitted).  This is because "[d]isability hearings are not adversarial in nature."  *Id* (citation omitted).

The Commissioner's decision must be affirmed if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted).  The Commissioner's decision must be upheld, however, where "the evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

District courts have the power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the case. 42 USC § 405(g). The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. *Id*.

## ANALYSIS

Davis alleges that the ALJ erred by: (1) failing to give "great weight" to the Department of Veterans' Affairs ("VA") Disability Rating; (2) failing to consider Davis' need to lie down and improperly rejecting his testimony; (3) improperly rejecting the opinions of treating doctors; and (4) failing to consider the severity of Davis' mental impairments and psychologically based pain.

For the reasons that follow, this court finds that the ALJ erroneously discredited Davis' testimony, improperly rejected Dr. Campbell's opinion. and failed to consider and assign proper weight to the part of the VA decision relating to bilateral shoulder pain.

## I.    Credibility Findings Regarding Davis

First, Davis argues that the ALJ erred by improperly rejected his testimony about his need to lie down.

### A.    Davis' Statements

Davis' health problems stem from shoulder injuries that occurred in 1973, while Davis was serving in the United States Marine Corps (Tr. 155) and had to move a helicopter blade frequently. Tr. 184. The record contains medical treatment reports dating back to 1997, which

reflect subjective symptoms of increased bilateral shoulder pain over the years, radiating up the

neck and upper back, and down to the "mid-LS spine," as well as problems sleeping. *See*

Tr. 184-86, 195, 196, 202, 203, 244, 246, 247.

On January 8, 2001, Davis described to Dr. Stephen Campbell that he had "continuing

severe and increasing bilateral shoulder girdle pain, increasing with any kind of movement or

use of his shoulder, with driving a car, or with any other activity." Tr. 188. The only thing that

helped relieve this pain was "lying supine, and relaxing the muscles." *Id*. The pain markedly

interfered with his ability to work "because any movement in his job as a mechanic increase[d]

his pain." Tr. 188-89. He received help from his coworkers at Boeing, who "open doors for him

and turn wrenches for him." Tr. 189. He also complained of increasing sleep disturbance, and

"increasing depression and anxiety because of his difficulties working." *Id*.

During a June 8, 2001 appointment with Dr. Jean Marie Wyles, Davis reported "an

aching, stabbing and tingling pain which he has around his shoulder blade, at the superior,

medial and inferior aspects. With severe flares of his pain, it will radiate around his thorax but

not to the midthoracic line." Tr. 249-50. He reported sleeping very poorly, not more than two to

three hours a day and awakening sore. Tr. 250. Work and activity significantly increased Davis'

pain: for example, after he mowed the lawn, he was "down" for 2 days. *Id*. Sitting caused him

lower back pain, so "he [stood] all the time including at work." *Id*.

Davis stopped working on June 12, 2001, because of pain caused by snapping scapula,

chronic myofascial pain syndrome, fibromyalgia, depression, anxiety and significant sleep

disturbance. Tr. 107. He experienced severe pain, cramping and muscle spasms, which

prevented him from sitting or standing for more than five to 10 minutes at a time, affected his

ability to bend or reach, and ultimately prevented him from working.  Tr. 107, 114.  His severe cramping pain "greatly reduce[d] [his] concentration, as [did] the depression, anxiety and sleep disturbance."  Tr. 114.  These medical and psychological problems had caused him to miss "a great deal of work."  *Id*.  While working, Davis' absences were covered by the Federal Medical Leave Act ("FMLA").  Tr. 107.

On a Claimant Fatigue Questionnaire dated October 28, 2001, Davis described that on an average day, he got two to three hours of sleep, stood "most of the day, because of [his] inability to sit for more than 5-10 minutes at a time," had "[f]requent 'so called napping and immobility,'" constant pain in the neck, shoulders, upper, mid and lower back, and undertook minimal activities.  Tr. 161.  He could walk for one hour before rest and could stand for two hours before rest.  *Id*.  He needed to rest between activities such as "dressing, daily hygiene, walking and other normal activities."  Tr. 159.  Moreover, chronic fatigue affected his concentration and made him feel anxious, depressed,  angry, extremely fatigued, bored and worthless.  Tr. 159, 161.

On October 29, 2001, Davis told psychologist Paul S. Stoltzfus, Psy.D., that he could "stand for about an hour before his knees [got] tired and he had to sit down and rest," and could only "sit for about ten minutes before the pain in his shoulders [became] significantly worse and he [had] to get up and walk around again."  Tr. 209.  Davis rated his level of pain an 8 to 9 on a 1 to 10 scale.  Tr. 208.  The pain was chronic and consistent every day, and he experienced "flare ups of excruciating pain" one to four times a day, often towards the end of the day.  *Id*.  The pain was "increased by any type of repetitive motion limiting his ability to do anything with his hands," and became worse throughout the day, spreading from his shoulders to his elbows, his

9 - FINDINGS AND RECOMMENDATION

mid and lower back and his knees.  Tr. 208-09.  Chores such as mowing the lawn or helping out in the kitchen resulted in increased pain, making him "basically nonfunctional for several days." *Id*.  He spent his time throughout the day "alternating between sitting and standing and noted that standing position results in less stress to the shoulders and consequently less pain than sitting down."  Tr. 208.  He slept about three to four hours a night even with the use of Trazodone.  *Id*.  Davis "acknowledged symptoms of depression and anxiety," "loss of appetite, sleep loss and a sense of hopelessness."  *Id*.  He thought that "over the past several months the insomnia, increasing pain and dysphoria have diminished his ability to concentrate and focus on written material."  *Id*.

On January 2, 2002, Davis told his primary physician, Dr. Randy Boespflug, that he was experiencing increased tightness and spasms in his back, with night-time "spasm and jerking." Tr. 271.  His knee pain was becoming "even more severe."  *Id*.  He was "able to ambulate about 50 feet" and was standing because he could not sit more than about 10 minutes.  *Id*.

At the first administrative hearing on April 14, 2003, Davis testified that he was missing so much work at Boeing that he had to apply for medical leave under the FMLA.  Tr. 35.  He could "do something [light] for a couple of hours . . . then [had] to lay down for a couple of hours" to let the muscles relax.  *Id*.  Sitting caused his back to spasm and cramp so he tried not to sit, except for five to 15 minutes in a car if he needed to go somewhere.  Tr. 37, 41.  He testified that he spent his day "pretty much" standing up, but after standing for three to four hours, he had to lie down for a while.  Tr. 40-41.  He got about two to three hours of "unrestful sleep" a night, unable to be comfortable because of the pain.  Tr. 40.  The pain medication affected his ability to concentrate.  Tr. 41.

10 - FINDINGS AND RECOMMENDATION

In a mental health evaluation conducted for the VA by Dr. Gary Sachs on May 16, 2002, Davis "suggested that he spends up to 14 hours a day in bed," "sleeps for one hour at a time before being awakened by pain," and finds it difficult to achieve a comfortable position.  Tr. 301. He "suggested he requires help tying his shoes and putting on his blue jeans because of pain." *Id*.  His wife completes the household chores.  *Id*.  Davis stopped driving, gave up camping, hiking and sporting activities two years before because of increased pain in his shoulders.  *Id*. He was becoming irritable, testy and cranky with his family, had given up leisure activities, and was unable to name a pleasurable event.  *Id.*  Although he was not suicidal, he "endorsed feelings of hopelessness and worthlessness" and thought his concentration was poor.  *Id*.

During a physical examination conducted by Dr. David Hook on May 22, 2003, Davis reported that the scapulas "grind, pop, and swell," and "muscles elsewhere throughout his body attempt to compensate, producing his pain."  Tr. 312.  The pain was "aching, stabbing and sharp in his neck, over the upper and mid back, over the elbows, and the knees."  *Id*.  He rated his pain level to be at least 7 on a scale of 1 to 10.  *Id*.  He also described numbness in his hands.  *Id*.

In a May 29, 2003 letter, Dr. Boespflug wrote that Davis reported he had "to recline with sitting and standing, causing increased spasm and tightness in the upper body."  Tr. 326.  The only way to relieve the pain was "to lie down to relax the upper back muscles."  *Id*.

On January 26, 2004,  Davis complained to Dr. Campbell of "pain all over," with a "deep, dull aching which markedly interferes with his activity.  It increases with any use and with weather changes; it does tend to decrease with rest."  Tr. 384.  Other symptoms included "a profound sleep disturbance with light, restless sleep, hypervigilant sleep, and daytime fatigue." *Id*.  In the previous year and a half he had experienced "slowly progressive knee pain, much

greater on the left than the right," with a sensation of "his knee giving out." *Id*. He had

difficulty doing much activity around the house at all; he was "able to do most of his simple

activities of daily living with assistance," but sometimes was "unable to do this." *Id*.

At the April 18, 2005 administrative hearing, Davis testified that his condition had

worsened since he quit work. Tr. 410. Pain in his back came "around [his] ribcage, because all

the muscles are tightening, and it feels like [he is] having a heart attack." *Id*. He could lift five

to 10 pounds at the most. Tr. 411. His knees had gotten worse since the 2003 administrative

hearing. Tr. 414. He spent most of his days listening to talk radio shows and "tinkering around

the garage." Tr. 406. On a typical day, he would listen to the radio and "might go out and try

and build a little birdhouse or something like that," but he could "only do so much, for so long"

with the movements of his arms. Tr. 411. The longest he could sit without it being "unbearable"

was 30 to 45 minutes. Tr. 412. Because he found standing a more relaxing posture, he stood

"most of the day." Tr. 411-12.

If he "over[did]" it, Davis had to lie down (but not really nap) for two to three hours.

Tr. 406. How often he needed to lie down varied, depending on what he had been doing: "[i]t

could be one time a day and then none the next day. And then if I do something I shouldn't be

doing, I'll be, you know, down for an hour, two hours." Tr. 412, 419. If Davis spent three to

four hours standing and simply listening to the radio, then he just "hobble[d] around the garage"

to change positions. *Id*. On average, he spent "probably eight hours a day" standing in his

garage, doing one or all of the following: "listening to talk radio," "standing still," "walking

around," "using a saw," "painting," "cleaning" or "sanding something," but not doing any

"major projects." Tr. 421.

12 - FINDINGS AND RECOMMENDATION

However, if he had been "actually working on something" for three or four hours, then he needed to lie down to relieve the pain. Tr. 419. If he overdid it by "bending over too much or at the wrong angle, or walking to get a tool" and having his knees "come out from under [him]," then he had to recline. Tr. 422. Other examples of "overdoing it" were light gardening or picking up something. Tr. 406. Davis summed up his need to lie down as follows: "[I]f I don't screw myself up, I may not have to lay down, you know, during that day. But, you know, like if I bend over too much, or the wrong way, or my knees are acting up, then I have to lay down." Tr. 423.

He also had difficulty sleeping because he could "only lay on [his] shoulder for a little bit at a time. Then [he had] to roll over to this one or lay on [his] back." Tr. 413. On a good night he got about two to three hours of sleep, then spent the other few hours of the night standing out in his garage and listening to the radio. *Id*. When asked about depression, Davis thought it was "just a factor." Tr. 405. He had been "in aviation" for 30 years and his inability to do something he loved made him feel like he was "not worth anything," which got to him at times. *Id*.

**B.    Legal Standard**

When assessing the credibility of a claimant's statements, the ALJ is required to consider the entire record. SSR 96-7p, 1996 WL 374186 (July 2, 1996). A general assertion that a claimant is not credible is insufficient. The ALJ must give specific reasons, supported by substantial evidence, indicating that the ALJ has not arbitrarily discredited a claimant's testimony. *See Thomas v. Barnhart*, 278 F3d 947, 958-59 (9th Cir 2002).

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of

13 - FINDINGS AND RECOMMENDATION

symptoms.  *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996).  "[O]nce the claimant

produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a

claimant's subjective complaints based solely on a lack of objective medical evidence to fully

corroborate the alleged severity of pain."  *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991)

(*en banc*) (citation omitted).  "While subjective pain testimony cannot be rejected on the sole

ground that it is not corroborated by objective medical evidence, the medical evidence is still a

relevant factor in determining the severity of the claimant's pain and its disabling effects."

*Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2).

        If the ALJ finds that the claimant's testimony regarding the severity of symptoms is not

credible, the ALJ '"must specifically make findings which support this conclusion" and the

findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected

the claimant's testimony on permissible grounds and did not arbitrarily discredit" it.  *Bunnell*,

947 F2d at 345 (internal quote marks and citations omitted).  If there is no evidence of

malingering, the ALJ may reject symptom evidence only by giving clear and convincing reasons,

including which testimony is not credible and what facts in the record lead to that conclusion.

*Smolen*, 80 F3d at 1281, 1283-84; *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

        When evaluating a claimant's credibility, the ALJ must consider objective medical

evidence together with the claimant's daily activities; the location, duration, frequency, and

intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness,

and side effects of any medication; treatment other than medication; measures used to relieve

symptoms; and functional limitations caused by the symptoms.  *Smolen*, 80 F3d at 1284; *see also*

SSR 96-7p.  In addition, the ALJ may rely on:

14 - FINDINGS AND RECOMMENDATION

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Smolen*, 80 F3d at 1284 (citations omitted).

### C.    The ALJ's Credibility Findings

The ALJ found Davis' testimony "general[ly] credible to the extent that he has medically determinable impairments that do cause vocationally relevant limitations, but not his inability to perform any basic work activities." Tr. 338.  Because Davis produced objective medical evidence of underlying impairments that could reasonably be expected to produce some degree of symptom with no affirmative evidence of malingering, the ALJ had to assess Davis' credibility regarding the severity of symptoms and only discredit his testimony for clear and convincing reasons.  The ALJ decided that Davis' allegations "are not entirely credible in light of the treatment record, the reports of evaluating physicians, and his daily activities."  *Id.*

According to the ALJ, while Davis may lie down during the day, he has submitted no evidence that this is a medical necessity, has made inconsistent statements, and "himself denies the need to lie down."  *Id*.  The ALJ also found that Davis has failed to submit evidence that the use of a cane is a medical necessity.  *Id*.  In response to allegations of severe pain in Davis' shoulder, the ALJ noted that medical exam notes discuss his well-developed upper extremity muscles.  *Id*.  Lastly, the ALJ found that in light of Dr. Hook's and Dr. Wyles' evaluations, Davis' allegations that he can lift only five pounds, sit only 15 minutes, and must lie down after doing any activity for two hours are not credible.  *Id*.

### D.    Analysis

15 - FINDINGS AND RECOMMENDATION

Davis first contends that in accordance with SSR 96-7p, the ALJ should have given his testimony concerning his need to lie down greater weight, whether or not such rest had been prescribed by any physician.  The ALJ rejected this testimony because Davis offered no evidence of medical necessity.  However, SSR 96-7p does not require that the measures used for relieving symptoms be recommended by a physician.  To the contrary, when assessing a claimant's credibility, the ALJ must consider "*in addition to* the objective medical evidence," certain factors such as "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., *lying flat on his or her back*, standing for 15 to 20 minutes every hour, or sleeping on a board)."  SSR 96-7p (emphasis added).  Thus, the lack of a physician's prescription to lie down is not a clear and convincing reason to reject Davis' testimony.

Next, Davis contends that the ALJ rejected his need to lie down by misquoting and finding false inconsistencies within his testimony.  The ALJ found Davis' statements about his functional limitations to be inconsistent with his daily activities, explaining:

> The claimant states he stands all day, as this is most comfortable to him. He states he sleeps little because reclining is painful.  However, at Exhibit 9F/3 he reports he sleeps fourteen hours a day.  The claimant states he works in the garage all day, standing, tinkering and listing [sic] to talk radio.

Tr. 338.

The ALJ did misquote Davis' statements to find inconsistencies.  A review of the record reveals that Davis does not sleep 14 hours a day, as stated by the ALJ, but *spends* up to 14 hours a day in bed.  Tr. 301.  That same record goes on to state that Davis only sleeps "for one hour at a time before he is awakened by pain" and that he "finds it difficult . . . to achieve a comfortable position."  *Id*.  Contrary to the ALJ's conclusion, it is not inconsistent for Davis to spend up to

16 - FINDINGS AND RECOMMENDATION

14 hours a day in bed, but sleeping only an hour at a time due to pain.  In addition, the ALJ erred

by stating that Davis stands *all day* working, tinkering and listening to talk radio.  Instead, he

testified that he spends *most of the day*, *eight hours a day* standing.  Tr. 421.  An important

distinction exists between spending eight hours *a day* standing and eight hours *at a time*

standing.  Several daily hours of light activity with frequent rest period do not equate to an

ability to work full-time.  On days when Davis "overdoes it," he has to lie down for one to three

hours after standing for three to four hours.  Tr. 406, 412, 419.

   The ALJ also found that Davis' allegations are inconsistent with his activity of going

fishing for one to two hours every three weeks.  Tr. 338.  On October 26, 2001, Davis' wife

listed that as Davis' only leisure activity.  Tr. 141.  However, suh activity is not *per se*

inconsistent with Davis' alleged physical limitations.  Moreover, when asked over four years

later in 2005 about his hobbies, Davis did not mention fishing.  He stated: "I listen to the radio, I

might go out and try to build a little birdhouse or something like that.  But, you know, any

movements of my arms you know, I can only do it so much, for so long.  So I – there's a lot of

things I'd like to do, but I can't."  Tr. 411.  Contrary to the ALJ's interpretation, this testimony

leaves open the possibility that sometime between 2001 and 2005, Davis stopped fishing.

   The ALJ also observed that Davis has "well developed upper extremity muscles" which

he found inconsistent with Davis' "allegations of years of inability to use . . . his upper

extremities."  Tr. 338.  However, the observation that Davis had "relatively well-developed arm

muscles" was made in a physical examination conducted by Dr. Wyles back in June 2001, the

same month Davis quit his job as an aircraft mechanic.  That an aircraft mechanic who is

required to lift 25 to 30 pounds at work has relatively well-developed arm muscles is neither

17 - FINDINGS AND RECOMMENDATION

surprising nor a persuasive reason for rejecting testimony about the subsequent severity of
Davis' pain symptoms.

Finally, the ALJ found Davis not credible due to "no evidence that the use of a cane is a
medical necessity." Tr. 338. The ALJ noted that according to Dr. Hook, Davis' gait was normal
with or without the cane. *Id*. Dr. Campbell also noted that the Davis "had a somewhat wide-
based gait because of his tremor and sensation of unsteadiness," conducted a physical
examination of the knee, which appeared normal, and ordered an MRI of Davis' knee, the results
of which are unavailable. Tr. 386. Dr. Sachs observed that Davis "transferred slowly and
walked with the aid of a cane." Tr. 300. Davis testified that his knees "come out" from under
him on a fairly regular basis. Tr. 422. Dr. Hook noted that Davis was using the cane "probably
more for balance." Tr. 313. Based on this record, it is quite possible that Davis uses the cane for
balance in order to prevent falls when his knees give out. Yet the ALJ never asked Davis why he
was using the cane. Before jumping to a potentially incorrect assumption, the ALJ should have
developed the record to create a context for why Davis was using the cane.

The ALJ also rejected Davis' testimony based on differences between his demonstrated
functional abilities during the evaluations by Drs. Hook and Wyles and his allegations that he
can lift only five pounds, sit only 15 minutes, and must lie down after doing any activity for two
hours. *Id*. However, as discussed next, the ALJ erred by rejecting the opinion of his treating
physician, Dr. Campbell, in favor of the opinions of Drs. Hook and Wyles. Therefore, this is not
a convincing reason for rejecting Davis' testimony.

In conclusion, none of the reasons offered for the ALJ for rejecting Davis' statements are
clear and convincing. Whether these errors require awarding benefits or remanding for further
administrative proceedings is discussed below.

18 - FINDINGS AND RECOMMENDATION

///

## II.    Treating Doctors' Opinions

The ALJ gave the opinions and assessments of Drs. Hook and Wyles great weight,
finding them to be consistent with the treatment record, but accorded little weight to the opinions
and assessments of Drs. Boespflug and Campbell.  Tr. 238.

Davis argues that the ALJ improperly rejected the opinions of his treating physicians,
Drs. Boespflug and Campbell, by giving reasons that are not specific and legitimate.

### A.    Legal Standard

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See
Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1195 (9th Cir 1999) (citation omitted).
Generally, a treating physician's opinion is afforded the greatest weight in disability cases
because "the treating physician is employed to cure and has a greater opportunity to know and
observe the patient as an individual."  *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993)
(citations and internal quote marks omitted).

A treating physician's opinion is given controlling weight when it is "well-supported by
medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with
other substantial evidence in the record.  20 CFR § 404.1527(d)(2).  However, a treating doctor's
uncontroverted opinion on issues that are reserved to the Commissioner is neither controlling nor
given any special significance.  20 CFR § 404.1527(e); *see also* SSR 96-5p, 1996 WL 374183
(July 2, 1996).  Whether an individual is "disabled" under the Social Security Act is an issue
reserved to the Commissioner.  SSR 96-5P.

An uncontradicted treating doctor's opinion may only be discredited for "clear and
convincing reasons."  *Thomas*, 278 F3d at 957 (citation omitted)*.  If it is contradicted by the

19 - FINDINGS AND RECOMMENDATION

opinion of another doctor, the ALJ may reject the treating doctor's opinion by providing

"specific and legitimate reasons" supported by substantial evidence in the record.  *Lester v.*

*Chater*, 81 F3d 821, 830 (9th Cir 1996) (citation omitted).

**B.    Physicians' Opinions**

**1.    Dr. Wyles**

Dr. Wyles, a consulting psychiatrist, conducted a physical examination of Davis on

June 8, 2001.  Tr. 249.  She observed that he was "in no apparent distress," moved his head and

arms "freely" in conversation, and had a rigid kyphosis.[6]  Tr. 250.  Davis stood during the entire

exam, except when he was supine for testing his range of motion.  *Id*.  Strength testing in his

upper extremities was "full," and he had "relatively well-developed arm muscles."  *Id*.  He had a

focal tenderness at T7 in the thoracic spine, rhomboids and serratus anterior, an "exquisitely

tender" area at the insertion of his levator scapulae, and a restricted range of motion in his

shoulders.  Tr. 250-51.  He also had some "crepitus consistent with the motion of his scapula

against his posterior ribs with abduction of his arms."  Tr. 251.  Dr. Wyles concluded Davis "did

not have enough trigger points, particularly in his lower extremities and low back to qualify for

the diagnosis of fibromyalgia," and there was "no warmth, swelling or erythema."  *Id*.  She

diagnosed Davis with chronic myofascial pain in the scapular supporting muscular.  *Id*.  "His

sleep disorder may be a major contributing factor to his ongoing musculoskeletal pain.  In

addition his inability to relax can contribute to muscle pain."  *Id*.  She also suggested that Davis

consider job retraining through the Division of Vocational Rehabilitation.  *Id*.

---

[6] Kyphosis is an "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side." DORLAND'S POCKET MEDICAL DICTIONARY (25th ed. 1995).

20 - FINDINGS AND RECOMMENDATION

While Dr. Wyles believed that "[l]ifting 25-30 pounds at work certainly is flaring [Davis']

symptoms, she concluded that he was "employable in an alternative job." *Id.* She was silent

about what physical and mental exertion this alternative job might require.

      **2.**      **Dr. Hook**

Nearly two years later, on May 22, 2003, Dr. Hook conducted a physical examination of

Davis. Tr. 312-15. He noted that "[t]his is a man who is heavily tanned who prefers to stand

using a cane." Tr. 313. Davis used a five-foot tall cane "as someone might use a staff, probably

more for balance," and his gait is "normal" and "unremarkable with or without the cane."

Dr. Hook observed that Davis "seems to move quite easily through normal activities and is able

to get up and down off the examining table without difficulty. Uses his cane but walks as well

without it." Tr. 314.

Dr. Hook noted that "[t]here is normal muscle tone and bulk throughout the cervical,

thoracic and lumbosacral spine," that palpating areas of pain elicited "little real sign of

tenderness or pain," that muscle tone was "high across both sides of the joint," and that only two

of the 18 fibromyalgia trigger points were classically positive, in the areas superior to the left

and right scapula, with other areas being "uncomfortable" rather than painful. Tr. 313. Davis

was "able to demonstrate the scapular popping and snapping, but show[ed] no expression of pain

as he does it." *Id.* On the strength exam, results were a "rachety give-way weakness in most

muscle groups, but it is quite symmetric, and with static single trial testing, I suspect is 5/5 and

probably baseline for him." Tr. 314. Although Davis reported that "his knees give away and he

falls," Dr. Hook noted "no effusion in any of the joints," "[g]ood medial and lateral collateral

ligamentous stability, good anterior and posterior cruciate ligamentous stability, and no meniscal

21 - FINDINGS AND RECOMMENDATION

signs." *Id*.  Dr. Hook diagnosed a chronic myofascial scapular pain and concluded that Davis

did not meet the criteria for fibromyalgia.  *Id*.

 When asked to make work recommendations, Dr. Hook distinguished between Davis'

subjective complaints, his demonstrated functional abilities, and the total examination:

> Based on the patient's subjective complaints he would appear to be unable
> to work at all.  Based on his demonstrated functional abilities in the
> examination today it is projected that he should be able to stand and move
> about, about [sic] six hours, sit at least two hours, lift and/or carry
> occasionally 10 pounds and frequently 10 pounds.  He should be able to
> occasionally climb, balance, stoop and/or bend, but he declined to crouch,
> squat, kneel and/or crawl.
> However, based on today's total evaluation, I do not find a clear
> rheumatologic, neurologic, or orthopedic reason that the patient should be
> limited in sitting, lifting occasionally or frequently, or postural activities.
> Given his age, sex, and level of conditioning, I would project that he
> should be able to lift and/or carry occasionally 20 to 40 pounds and
> frequently 10 to 20 pounds, and should be able to perform postural
> activities such as climbing, balancing, and so forth without limitation.

Tr. 314-15.

 Disability Determination Services conducted measurements which revealed that Davis

had a demonstrated capability to lift or carry less than 10 pounds occasionally and frequently in

an 8-hour workday with normal breaks.  Tr. 316.  Davis could occasionally climb, balance, stoop

or bend.  *Id*.  He declined to do crouching, squatting, kneeling and crawling.  *Id*.

### 3.   Dr. Boespflug

 Dr. Boespflug began treating Davis on August 17, 2000, nearly a year prior to the date

Dr. Wyles examined Davis.  Tr. 296.  On August 27, 2001, a few months after Dr. Wyles'

examination, Dr. Boespflug made a contrary recommendation of a "continuing application for

disability.  Doubt [Davis] is employable with out [sic] considerable retraining as per Dr. Wyles."

Tr. 241.  On the same day, Dr. Boespflug signed a note excusing Davis from jury duty because

22 - FINDINGS AND RECOMMENDATION

he "can not sit or stand for any more than about 5 min." Tr. 287.  On a September 20, 2001 form

entitled Physician's Report on Disability Application, Dr. Boespflug marked that the nature of

Davis' disability was "total" (*i.e.* "incapable of continuing employment in any gainful

occupation for which substantial retraining would not be required), its duration was

"permanent," and Davis was a "fair" candidate for rehabilitation.  Tr. 290-91.  He added the

comment that "will be Rehab/Training to some field with minimal upper body strength and

effort." Tr. 291.

On a Physical Assessment form completed on December 18, 2001, Dr. Boespflug marked

that Davis could sit for four hours at one time and six hours in an 8-hour day, stand for one hour

at a time and two hours in an 8-hour day, walk for half an hour at a time and one hour in an

8-hour day, and lie down for six hours at a time and eight hours in an 8-hour day.  Tr. 289.  In

Dr. Boespflug's opinion, Davis could lift or carry 11-20 pounds occasionally and 6-10 pounds

frequently.  *Id*.  He could never climb ladders, crouch or crawl, could occasionally stoop, kneel

and reach, and could frequently climb stairs and use hands.  *Id*.  When asked whether Davis

could do the above physical demands (*e.g.* standing, sitting, lifting) on a sustained basis (*i.e.*,

eight hours a day, five days a week or equivalent work schedule, with two breaks and a lunch),

Dr. Boespflug circled "no."  *Id*.

On January 9, 2002, in a letter addressed to the VA, Dr. Boespflug referred to Dr. Wyles'

examination, adding: "[h]is employability, however, is significantly limited by the limitation of

less than 25 to 30 pounds as so stated, and as has been proven, this would actually be a

maximum for him since he is for the most part not able to even maintain a seated position for any

length of time." Tr. 275.

23 - FINDINGS AND RECOMMENDATION

On a December 10, 2002 Attending Physician's Statement form, Dr. Boespflug marked that Davis is ambulatory, retrogressed, restricted to "very limited lifting, upper body use," and "unable to continue job in airport manufacture." Tr. 296-97. He categorized Davis' physical impairment as "Class 5 - Severe limitation of functional capacity; incapable of minimal (sedentary) activity." Tr. 297. He believed Davis' prognosis was "poor" and that his condition "continues to deteriorate." *Id.* Asked to estimate the date of Davis' return to work, he answered "no return expected." *Id.* He did not consider Davis to be a viable candidate for Vocational Rehabilitation because of "upper body and back problem." *Id.*

In a May 29, 2003 letter, Dr. Boespflug found that Davis' stated need to lie down to relax the upper back muscles for "two hours per working day" "may well be both reasonable and minimal." Tr. 326.

### 4.    Dr. Campbell

Dr. Stephen Campbell, Chief of the Rheumatology section for the local VA, began treating Davis on January 5, 1997 (Tr. 392), saw him twice in 1999 (Tr. 202, 203), and once in 2000 (Tr. 195). Dr. Campbell's last two examinations of Davis took place on January 8, 2001 (Tr. 188-89) and January 26, 2004 (Tr. 384-86).

Following the first visit, Dr. Campbell ordered extensive tests: "X-rays of his cervical and thoracic spine showed mild degenerative changes;" MRI scan of his cervical and thoracic spine, which also showed "mild degenerative changes, with no specific evidence of nerve or spinal cord compression;" EMG of the left arm, which was normal; nerve conduction study of

the left arm, which was normal; laboratory tests including a "normal CBC, chemistry screen, liver function tests, CPK,[7] and TSH.[8]"  Tr. 188.

On April 4, 1999, Dr. Campbell admitted he really did not have any idea what kind of pain syndrome Davis suffered from.  Tr. 204.  He did not order a new lab, but referred Davis to physical therapy and the Orthopedic Department.  *Id*.  On September 9, 1999, after a physical examination, Dr. Campbell concluded Davis' condition was most like a myofascial pain syndrome which still did not easily address the initial source of the scapular pain.  Tr. 202.  He had no good ideas for treatment, as his best suggestions had been an orthopedic opinion and physical therapy, "but [Davis] missed those appointments."  *Id*.  The orthopedic appointment was rescheduled.  *Id*.

On April 10, 2000, Davis was seen by Dr. William A. Lussier in the Orthopedic Department.  Tr. 196.  Dr. Lussier noted that Davis was "well-developed" and "in no acute distress."  *Id*.  He agreed with Dr. Campbell's assessment of myofascial pain and further diagnosed Davis with "snapping shoulder syndrome."  Tr. 197.  He referred Davis to the orthopedic shoulder clinic to evaluate the possibility of shoulder intervention, although he doubted that scapular fusion would benefit Davis.  *Id*.  That same day, Dr. Campbell concluded that Davis is "clearly evolving into a diffuse myofascial pain syndrome and is heading for something like fibromyalgia.  Psychosocial factors likely playing some role."  Tr. 195.

---

[7]  CPK is "creatine phosphokinase," an "enzyme catalyzing the reversible transfer of phosphate from phosphocreatine to ADP, forming creatine and ATP; of importance in muscle contraction. Certain isozymes are elevated in plasma following myocardial infarctions."  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[8]  TSH stands for "thyroid-stimulating hormone."  DORLAND'S POCKET MEDICAL DICTIONARY (25th ed. 1995).

25 - FINDINGS AND RECOMMENDATION

Dr. Campbell was unsure whether there was much he could do to help. *Id.* He noted that Davis was "clearly limited in his ability to work because of all this, but whether he will meet criterial for Soc Security disability is ??" *Id.*

On January 8, 2001, Dr. Campbell performed a musculoskeletal examination. Tr. 189. He found that Davis' "hands and elbows are essentially normal." *Id.* Davis had "markedly limited range of motion in both shoulders in all directions, with severe tenderness throughout his entire shoulder girdle, consistent with diffuse muscle spasm and trigger points," and his cervical spine range of motion has "30 degrees of flexion, 30 degrees of right and left rotation, and 20 degrees of extension." *Id.* "The remainder of [Davis'] musculoskeletal examination is unremarkable." *Id.* Dr. Campbell diagnosed Davis with " an ill-defined regional muscle pain syndrome, most compatible with severe myofascial pain, superimposed on the prior diagnosis of 'snapping scapula' syndrome. We have exhausted diagnostic and therapeutic attempts, and I have no further suggestions for his care." Tr. 189. He believed Davis' pain had a "psychological component" "consisting of severe anxiety and depression." Tr. 190. He concluded that Davis was "clearly incapacitated by this pain syndrome, and has chronic pain which essentially prevents him from doing any kind of meaningful work." *Id.* He added: "Although I do not know why this is happening to him, I think that his disability is probably quite real, and he probably cannot be expected to continue to work in the future." *Id.*

On September 18, 2001, Dr. Campbell completed a Physician's Report on Disability Application. Tr. 205-06. When asked about the extent of Davis' disability, he referred to his letter which is not included in the record. Tr. 205.

After a three year gap, Dr. Campbell conducted a physical examination of Davis on January 26, 2004. Tr. 384-88. Davis "had a somewhat wide-based gait because of his tremor

26 - FINDINGS AND RECOMMENDATION

and sensation of unsteadiness," but the underlying tremor and difficulty walking seemed to improve as the examination went along, and "may in fact, be due to anxiety." Tr. 385-86. Dr. Campbell did not think Davis had an "underlying physical cause for his tremor and gait instability." *Id.* He concluded that Davis had "essentially evolved into fibromyalgia, consisting of a severe diffuse pain syndrome with the appropriate modulating factors, a sleep disturbance . . . and multiple tender points. This seems to have developed on top of his underlying snapping scapula syndrome, which in general was thought to be a variant of a myofascial pain syndrome." Tr. 386. Regarding Davis' knee, Dr. Campbell thought that subjectively, Davis may be describing an internal derangement of the knee, but objectively, his knee examination was normal. *Id.* Lastly, Dr. Campbell found that Davis' anxiety and depression was "probably significantly worse than it was four or five years ago when I saw him previously." *Id.* He concluded that "[g]iven [Davis'] overall course over years, and his severe anxiety and probable depression, [Dr. Campbell] suspect[s] he will have chronic pain unresponsive to therapy. It will interfere with any significant physical activity other than simple ADLs; I think it is very unlikely that he can do any kind of physical labor." *Id.* Dr. Campbell ordered an MRI scan of the left knee, and planned to see Davis again "in about three to four months." *Id.* The record contains neither the results of the MRI scan nor any notes from subsequent appointments.

On April 20, 2004, Dr. Campbell completed a second Physician's Report on Disability Application. Tr. 389-90. He stated that he had not examined Davis since January 26, 2004, but marked that the nature of Davis' symptoms was progressive, his disability was total, the duration was permanent, and Davis was a poor candidate for rehabilitation. Tr. 389-90.

On January 15, 2005, Dr. Campbell completed an Attending Physician's Statement form. Tr. 392-93. He noted that he had last seen Davis on January 26, 2004. Tr. 392. He marked that

27 - FINDINGS AND RECOMMENDATION

Davis was "ambulatory" and "retrogressed," had "limited lifting and upper body use," was "unable to work in aircraft maintenance/manufacture," and was restricted to "very limited lifting and upper body use." Tr. 392-93. He did not consider Davis a viable candidate for vocational rehabilitation because of his age and chronic pain. Tr. 393. He believed Davis' prognosis was "poor" and did not know when his maximum medical improvement would be reached. *Id.* Asked to categorize Davis' physical impairment as defined in the Federal Dictionary of Occupational Titles, Dr. Campbell marked the "class 5" choice, defined on the form as "[s]evere limitation of functional capacity; incapable of minimal (sedentary*) activity. (75-100%)." *Id.* He left the category "mental/nervous impairment (if applicable)" blank. *Id.*

### C.    Analysis

Dr. Boespflug participated in Davis' medical care from August 17, 2000, until at least December 10, 2002. Dr. Campbell treated Davis six times between 1997 and 2004. Thus, both qualify as treating physicians. Drs. Wyles and Hook are examining physicians who each evaluated Davis once and whose opinions contradict those of the treating physicians, Drs. Boespflug and Campbell. Thus, the ALJ was required to provide specific and legitimate reasons for rejecting the opinions of Drs. Boespflug and Campbell.

///

///

### 1.    Rejection of Dr. Boespflug's Opinion

When according Dr. Boespflug's opinions and assessments little weight, the ALJ first found that them inconsistent with each other. Tr. 338. Dr. Boespflug did change his position over time regarding Davis' chances at rehabilitation: Davis could not be rehabilitated without considerable retraining (August 2001); he could be rehabilitated with training to a field with

28 - FINDINGS AND RECOMMENDATION

minimal upper body strength and effort (September 2001); he could sit for six hours, stand for two hours and walk for one hour in an 8-hour day, but could not sustain the physical demands of standing, sitting, lifting for eight hours a day, five days a week (December 2001); his employability was significantly limited by being unable to lift even less than 25 to 30 pounds (January 2002); he was restricted to very limited lifting and upper body use, unable to continue his job in airport manufacture, incapable of minimal (sedentary) activity, and not a viable candidate for Vocational Rehabilitation (December 2002).  However, this change in position can be explained by Dr. Boespflug's perception that Davis had "retrogressed" and his health "continue[d] to deteriorate."  Tr. 296-97.  Accordingly, this first reason to reject Dr. Boespflug's opinion is not legitimate.

However, the ALJ also gave other reasons to support his conclusion which are specific and legitimate.  With respect to Dr. Boespflug's opinion concerning that it "may well be both reasonable and minimal" for Davis to lie down to relax the upper back muscles for two hours a day, the ALJ found that it was unsupported by the treatment record or by Davis' demonstrated capacities when evaluated by Dr. Hook.  Tr. 326, 339.  Indeed, Dr. Hook concluded, based on a physical examination, that Davis demonstrated the functional ability to stand and move about for six hours, sit at least two hours, lift and/or carry occasionally 10 pounds and frequently 10 pounds.  Tr. 315.  In contrast, Dr. Boespflug's physical examination of Davis blatantly contradicts Davis' testimony.  As the ALJ pointed out, Dr. Boespflug noted in a December 2001 Physical Assessment Form that Davis could sit for four hours at one time and six hours in an 8-hour day (Tr. 289), which is inconsistent with Davis' testimony that he cannot sit for more than 30 to 45 minutes before it becomes "unbearable" (Tr. 412) and with Dr. Boespflug's January 2002 opinion that "for the most part [Davis is] not able to even maintain a seated position for any

29 - FINDINGS AND RECOMMENDATION

length of time." Tr. 275. Also inexplicable is Dr. Boespflug's opinion that Davis can stand for

one hour at a time and two hours in an 8-hour day (Tr. 289), when compared with Davis'

testimony that he stands most of the time, about eight hours a day on average (Tr. 421).

Moreover, just four months before on August 27, 2001, Dr. Boespflug wrote that Davis "can not

[sic] sit or stand for any more than about 5 min." Tr. 287. Given these inconsistencies, the ALJ

did not err by rejecting this portion of Dr. Boespflug's opinion.

The ALJ also rejected Dr. Boespflug's more recent opinions (namely December 2002)

because he failed to have Davis undergo any objective testing or diagnostic studies. Tr. 339.

Becase Davis does not offer any arguments to dispute this finding, it must be upheld as both

specific and legitimate.

## 2.     Rejection of Dr. Campbell's Opinion

The ALJ attributed little weight to Dr. Campbell's opinion. Tr. 339. He found that

Dr. Campbell's 2004 evaluation was performed at Davis' request and simply reiterated his

subjective complaints. Tr. 339. The ALJ found that although Dr. Campbell had previously

examined Davis in 2001, he did not have Davis undergo any objective testing or diagnostic

imaging studies. *Id*. The ALJ also found that Dr. Campbell's limits were "not based on any

objective criteria" and was contradicted by the opinions of Drs. Hook and Wyles. *Id*. Finally,

the ALJ attributed little weight to Dr. Campbell's 2004 conclusions because "he only actually

saw the claimant on two occasions within the previous five years." *Id*.

The ALJ erroneously concluded that Dr. Campbell did not have Davis undergo any

objective testing. After examining Davis in December 1997, Dr. Campbell ordered multiple

objective tests. While the actual test results are not in the record, Dr. Campbell incorporated

them in his January 8, 2001 notes. *Id*. He also referred Davis to the Orthopedic Department and

30 - FINDINGS AND RECOMMENDATION

to physical therapy and reviewed the Orthopedic Department's assessment.  Tr. 189.  No new laboratory samples or X-rays were taken on January 26, 2004, but Dr. Campbell performed a thorough physical, skin and musculoskeletal examination, and tested Davis' active and passive range of motion, reflexes, and fibromyalgia trigger points.  Tr. 384-86.  As the Ninth Circuit recognized in *Benecke v. Barnhart*, 379 F3d 587, 589 (9th Cir 2004), trigger points are the distinguishing method of diagnosing fibromyalgia, given the lack of other objective tests.

The physical examination conducted by Dr. Campbell is similar to the one done by Dr. Hook which consisted of a musculoskeletal exam, palpation of the areas of pain, and testing of fibromyalgia trigger points.  As both doctors conducted comparable physical examinations, the ALJ's decision to reject Dr. Campbell's 2004 opinion for lack of objective testing, while at the same time giving great weight to Dr. Hook's opinion, is not a specific and legitimate reason.

The ALJ also rejected Dr. Campbell's opinion because he only saw Davis on two occasions in five years.  This is an incorrect statement since Dr. Campbell actually met with Davis five times between 1999 and 2004.  Even so, the ALJ had no legitimate basis to reject a doctor's opinion because he only saw the claimant *twice* in five years, while at the same time placing great weight on the opinions of two physicians who each saw the claimant *once*.

The ALJ rejected Dr. Campbell's 2004 evaluation because it was performed at Davis' request and simply reiterated Davis' subjective complaints.  Tr. 339.  However, as discussed above, the ALJ erroneously rejected Davis' subjective testimony.  Moreover, Dr. Campbell's 2004 opinion did not simply reiterate Davis' subjective complaints.  It was based on a thorough physical examination, on previous objective testing, as well as on Dr. Campbell's 2001 opinion which was consistent with his 2004 opinion.

31 - FINDINGS AND RECOMMENDATION

The ALJ also rejected Dr. Campbell's opinion as being contradicted by the opinions of Drs. Hook and Wyles. All three doctors diagnosed Davis with chronic myofascial pain in the scapular area. After conducting physical examinations and testing fibromyalgia trigger points, the three doctors disagreed on whether Davis suffers from fibromyalgia. On June 8, 2001, Dr. Wyles concluded Davis "did not have enough trigger points, particularly in his lower extremities and low back to qualify for the diagnosis of fibromyalgia," and there was "no warmth, swelling or erythema." Tr. 251. On May 22, 2003, Dr. Hook agreed with Dr. Wyles, finding that "only 2 of the 18 fibromyalgia trigger points are classically positive, in the areas superior to the left and right scapula," and concluding that Davis does not meet the criteria for fibromyalgia. Tr. 313. On April 10, 2000, Dr. Campbell stated that Davis was "clearly evolving into a diffuse myofascial pain syndrome and is heading for something like fibromyalgia." Tr. 195. On January 8, 2001, Dr. Campbell identified tender trigger points in both shoulders, but found Davis' hands and elbows normal. Tr. 189. On January 26, 2004, Dr. Campbell concluded that Davis "has essentially evolved into fibromyalgia, consisting of a severe diffuse pain syndrome with the appropriate nodulating factors . . . and multiple tender points." Tr. 386.

The doctors also disagreed about Davis' functional limitations. In 2001, Dr. Wyles believed that "[l]ifting 25-30 pounds at work certainly is flaring [Davis'] symptoms," but that he was employable in an alternative job. Tr. 251. She suggested vocational rehabilitation. *Id*. Also in 2001, Dr. Campbell thought that chronic pain prevents Davis "from doing any kind of meaningful work," "his disability is probably quite real, and he probably cannot be expected to continue to work in the future." Tr. 189-90. In mid-2003, based on Davis' demonstrated functional abilities, Dr. Hook concluded that he should be able to stand and move for about six hours, sit at least two hours, lift or carry 10 pounds both occasionally and frequently. Tr. 314.

32 - FINDINGS AND RECOMMENDATION

According to Dr. Hook, Davis' real abilities were in the range of lifting and carrying occasionally 20 to 40 pounds and frequently 10 to 20 pounds, and being able to climb, balance, *etc*. without limitation.  Half a year later, Dr. Campbell believed Davis had chronic pain that would "interfere with any significant physical activity other than simple ADLs," and "it is very unlikely that [Davis] can do any kind of physical labor."  Tr. 386.  His opinion is corroborated by the decision of the VA to give Davis full unemployment disability payments upon concluding he suffers from a permanent disability based on a bilateral shoulder condition (as well as major depression, *see below*).  Tr. 371-74.

The opinions of treating physicians are entitled to greater deference than those of examining physicians.  *Lester*, 81 F3d at 830-31 (citations omitted).  The "opinion of a specialist about medical issues related to his or her area of specialty" is entitled to even greater weight. *Benecke*, 379 F3d at 594 n4, citing 20 CFR § 404.1527(d)(5).  Rheumatology is the specialty field for fibromyalgia.  *Id* (citation omitted).  Dr. Campbell was not only Davis' treating physician, but as a rheumatologist, he also is a specialist whose opinion on fibromyalgia is entitled to considerably more weight than the opinions of Dr. Wyles and Dr. Hook.  The ALJ offered no legitimate reason supported by substantial evidence in the record for his decision to reject Dr. Campbell's opinion in favor of Dr. Wyles' and Dr. Hook's opinions. Thus, the ALJ erred by rejecting Dr. Campbell's opinion.

### III.    <u>Mental Impairments</u>

Davis argues that the ALJ erred by finding that he had no have severe mental impairments.  However, the ALJ found that Davis suffered from "medically determinable impairments of *an adjustment disorder with mixed depression/anxiety*, a pain disorder, chronic

myofascial scapular pain, and probable fibromyalgia," all "considered to be *severe*."  Tr. 337 (emphasis added).

Davis further contends that the ALJ failed to consider the possibility of a psychological basis for his pain, as required by SSR 96-7p which states:

> [The ALJ] must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists, and the individual alleges pain or other symptoms but the medical signs and laboratory findings do not substantiate any physical impairment capable of producing the pain and other symptoms.

Specifically, Davis asserts that none of the evidence upon which the ALJ based the RFC finding took into consideration his psychological factors.  However, the ALJ's opinion did include psychological factors.  The ALJ found that Davis' "mental impairments cause mild restrictions in [his] activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace."  Tr. 340.  Due to Davis' moderate difficulties in maintaining concentration, persistence or pace, the ALJ concluded that Davis retains the RFC for "only semi-skilled work given his pain and mental capacity."  *Id*.

Moreover, the ALJ's findings are corroborated by two psychologists, Drs. Stolzfus and Sachs.  On October 29, 2001, Dr. Stolzfus diagnosed Davis with "adjustment disorder with depression and anxiety, chronic, secondary to physical pain," and reiterated that the "psychological factors are not primary."  Tr. 210.  Dr. Stolzfus gave Davis a Global Assessment of Functioning ("GAF") score of 60.  Tr. 210-11.  A rating of 51-60 on the GAF scale indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts

34 - FINDINGS AND RECOMMENDATION

with peers or co-workers)."  American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL

MANUAL OF MENTAL DISORDERS (4th Ed. 2000) ("DSM IV"), p. 34.  He recommended

counseling and stated that Davis is "at risk of developing Major Depressive Disorder without

psychotherapeutic or psychopharmaceutical intervention."  Tr. 211.  On May 16, 2002, Dr.

Sachs examined Davis and diagnosed "[p]ain disorder due to medical and psychological factors"

and "[m]ajor depressive disorder, chronic, mild to moderate, associated with medical condition."

Tr. 301.  He identified psychosocial stressors such as "[d]ecreased physical prowess, financial

strain, unemployment," and assigned Davis a GAF score of 57.  *Id.*

The psychologists' opinions clearly mark Davis' mental impairments as mild to moderate

and secondary to his medical condition, not rising to the level of disability.  The ALJ's findings

accurately reflect this level of mental impairments.

///


IV.    **VA Disability Rating**

Davis contends that the ALJ erred by failing to give great weight to the VA decision.

A.    **VA Decision**

Davis applied for and was awarded VA benefits.  Tr. 400.  By letter dated July 10, 2002,

the VA granted Davis' claim for a service connection on the basis of Major Depressive Disorder,

explaining:

> Your claim for service connection for major depressive disorder has been
> established as related to the service-connected disability of myofacial [sic]
> pain syndrome superimposed on snapping scapula syndrome, bilateral
> shoulders.  This condition is evaluated as 30% disabling from May 31,
> 2001, the date of receipt of claim . . . The medical evidence available for
> review indicates that your depression is directly related to your service
> connected shoulder condition.

35 - FINDINGS AND RECOMMENDATION

Tr. 14-15.

Davis was entitled to "the 100% rate effective June 13, 2001, because [he was] unable to work due to [his] service connected disability/disabilities." Tr. 12. He was "evaluated at 70 percent disabling" because the "[m]edical evidence shows that [he had] severe complications from both mental and physical disabilities. We have granted this increase effective June 13, 2001, the day following termination of [Davis'] employment." Tr. 15.[9] Davis' individual employability evaluation was not considered permanent, as the VA planned to reevaluate his level of disability in the future. *Id.* At the same time, Davis was denied a service connection for fibromyalgia because "there is no record of [Davis] being treated for fibromyalgia in service, nor does the available evidence link [his] current diagnosis with [his] service connected conditions or military service." *Id.*

In a later decision dated October 23, 2003, the VA changed Davis' individual unemployability to "permanent and total from June 13, 2001." Tr. 371. That decision relied on a letter from Dr. Boespflug, VA treatment records, a letter from the Aetna United Healthcare together with a copy of Davis' application for disability retirement, and a letter from Western Metal Industry Pension Fund. Tr. 374. The VA reached this decision because "the evidence shows you have had a bilateral shoulder condition since the 1970's, with progression of the condition to your current 30% disability evaluation for each shoulder, to include your secondary condition of major depressive disorder, and your conditions are considered static in nature." *Id.*

B.    **Legal Standard**

---

[9] It is clear from the July 2002 VA decision that the VA previously granted Davis a service connection on the basis of myofascial pain syndrome and snapping scapula syndrome, 40% disabling, but that decision is not in the record.

In the Ninth Circuit, the "VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework . . ." *McCartey v. Massanari*, 298 F3d 1072, 1076 (9th Cir 2002). For this reason, the VA disability ratings must be considered by the ALJ and are entitled to "great weight." *Id*. However, the ALJ may give less weight to a VA disability rating if he or she "gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id* (citation omitted).

**C.    Analysis**

Although the VA found Davis disabled based on both a chronic bilateral shoulder condition and major depression, it made findings related only to major depression. As required by the Ninth Circuit, the ALJ "*considered* the decision of the [VA] rating [Davis'] disability at 100 percent. . . based in part on a diagnosis of major depression." Tr. 339 (emphasis added). While not expressly assigning weight to the VA determination, the ALJ implicitly rejected the VA determination by noting that Davis had "not sought any mental health counseling," was only recently prescribed Trazodone, and was "not prescribed any no anti-depressant medication." *Id*. The ALJ also noted that Davis' receipt of monthly VA benefits "may well be a disincentive to his seeking other work because this sum is more than he previously earned while working." *Id*.

Although this latter reason is clearly not persuasive, the other reasons listed by the ALJ are supported by the record and persuasive. Furthermore, as discussed above, the ALJ incorporated the opinions of examining psychologists Drs. Stolzfus and Sachs at step two, where he found that Davis suffered from a *severe* adjustment disorder with mixed depression/anxiety, and at step three, where he included functional limitations caused by mental impairments in Davis' RFC. Based on the opinions of Drs. Stolzfus and Sachs, the ALJ had a valid reason for rejecting the VA disability finding based on major depression.

37 - FINDINGS AND RECOMMENDATION

However, the VA awarded Davis a service connection based on the bilateral shoulder condition before adding a service connection based on major depressive disorder. Because that decision is missing from the record, it is unknown what evidence the VA considered or what reasons it gave for reaching its decision. The ALJ did not address that basis for a VA disability.

The Commissioner bears the burden of developing the record even when the claimant is represented by counsel. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991), citing *Brown v. Heckler*, 713 F2d 441, 443 (9th Cir 1983). The record does contain Davis' VA medical records, which the ALJ reviewed. However, the ALJ failed to develop the record to add and consider the merits of the VA's decision to find a service connection based on Davis' bilateral shoulder condition. In that regard, the ALJ erred.


## V.    Remand for Further Administrative Proceedings

### A.    Legal Standard

Although the ALJ erred in several respects, the decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F3d 1172, 1178 (9th Cir), *cert denied,* 531 US 1038 (2000). That decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

The Ninth Circuit has established the following three-part test for determining when the court should grant an immediate award of benefits:

[when] (l)  the ALJ has failed to provide legally sufficient reasons for

> rejecting such evidence, (2) there are no outstanding issues
> that must be resolved before a determination of disability can
> be made, and (3) it is clear from the record that the ALJ would
> be required to find the claimant disabled were such evidence
> credited.

*Harman,* 211 F3d at 1178.

The second and third prongs of the test often merge into a single question:  whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *See id* at 1178 n7.

**B.    <u>Analysis</u>**

The first *Harman* prong is clearly satisfied.  The ALJ failed to provide clear and convincing reasons for rejecting Davis' testimony, failed to provide specific and legitimate reasons for rejecting the opinion of Dr. Campbell, a treating doctor and fibromyalgia specialist, and failed to develop the record to include the VA's disability decision based in part on bilateral shoulder pain.  The issue then is whether the ALJ would have to award benefits if the case were remanded.

Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating physician, "we credit that opinion as a matter of law."  *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989); *see also Lester*, 81 F3d at 834 (citation omitted).  Because the ALJ improperly rejected Dr. Campbell's opinion, it must be credited as a matter of law.

In 2001, Dr. Campbell thought that Davis was "clearly incapacitated by this pain syndrome," that chronic pain prevents Davis "from doing any kind of meaningful work," "his disability is probably quite real, and he probably cannot be expected to continue to work in the future."  Tr. 189-90.  In January 2004, Dr. Campbell diagnosed Davis with fibromyalgia and stated that based on his history, severe anxiety and probable depression, he suspected that Davis

39 - FINDINGS AND RECOMMENDATION

would have chronic pain "unresponsive to therapy" which would "interfere with any significant physical activity other than simple ADLs; I think it is very unlikely that [Davis] can do any kind of physical labor." Tr. 386. In a subsequent 2004 questionnaire, Dr. Campbell marked that the nature of Davis' symptoms was progressive, his disability was total, the duration was permanent, and he was a poor candidate for rehabilitation. Tr. 389-90. In a 2005 questionnaire, Dr. Campbell stated that Davis' present capabilities included "limited lifting and upper body use," his physical and mental limitations were "[being] unable to work in aircraft maintenance/manufacture," and that the following restrictions were placed on Davis: "very limited lifting and upper body use." Tr. 393. Dr. Campbell also marked that Davis had a "severe limitation of functional capacity; incapable of minimal (sedentary) activity." *Id*.

Clearly, Dr. Campbell believes that Davis cannot work even in a sedentary job and is totally disabled. However, a doctor's statement about a claimant's ability to work is not a proper medical source opinion, but an administrative finding reserved to the Commissioner. SSR 96-5p. A determination of disability has both a medical and a vocational component. 26 CFR § 416.960. Because a medical source does not have the expertise to comment on the vocational component of disability, a statement by a medical source that a person is unable to work is not accorded much weight. 20 CFR § 416.927(e)(1). The ALJ must consider medical opinions about a claimant's condition and functional limitations, along with all other evidence in the record, to determine whether a claimant is disabled under the Social Security Act. SSR 96-5p.

In *Harman*, where the ALJ had improperly discredited the opinion of the treating physician, the Ninth Circuit decided that it was inappropriate to conclude that the claimant was entitled to benefits as a matter of law where the treating doctor's conclusion that the claimant "is totally disabled is a medical rather than a legal conclusion" and "there was no testimony from the

40 - FINDINGS AND RECOMMENDATION

vocational expert that the limitations found by [the treating physician] would render [the claimant] unable to engage in any work." *Harman*, 211 F3d at 1180.[10]  In the "unusual case" where it is clear that the claimant is unable to perform gainful work, "even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate." *Benecke*, 379 F3d at 595.

Even if Davis' testimony is credited as true and considered together with Dr. Campbell's opinion, it is not clear from the record that he is unable to perform gainful work in the national economy.  The only functional limitations to which Dr. Campbell actually referred are Davis' inability to perform any physical activity other than simple ADLs, likely inability to perform any physical labor, and very limited lifting and upper body use.  Davis has testified that he stands in his garage most of the day, cannot sit more than 10 to 15 minutes, and needs to recline to rest after he stands for three to four hours *if* he overdoes it.  Examples of overdoing it include "actually working on something," doing physical activities such as mowing the lawn or light gardening, bending too much or at a wrong angle, walking to get a tool or picking up something he is not supposed to.  No hypothetical presented to the VE took into consideration both the functional limitations identified by Dr. Campbell and Davis' testimony that he only needs to recline when he overdoes it.

The case should be remanded for further administrative proceedings to: (1) develop the record to include the VA decision finding a service connection for Davis' bilateral shoulder pain, and articulate the weight given to this decision; (2) recontact Dr. Campbell to identify all

_____

[10]  The *Harman* court also decided to remand to the  administrative agency rather than grant benefits because the treating doctor's opinion on the claimant's limitations was presented only to the Appeals Council, and the ALJ did not have the opportunity to consider it.  311 F3d at 1180.  That situation is not applicable here.

functional limitations in light of Davis' testimony that he only needs to recline when he "overdoes it," and to clarify the basis for his finding that Davis is not fit for sedentary work; (3) solicit new VE testimony on the basis of the new evidence; (4) make a new disability determination.

///

///

///

///

///

## RECOMMENDATION

Based on the foregoing, the case should be REMANDED to the Commissioner pursuant to Sentence Four of 42 USC § 405(g) for further proceedings.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due by August 7, 2006.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 19th day of July, 2006.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

42 - FINDINGS AND RECOMMENDATION